[No. B130074. Second Dist., Div. Two. June 15, 2000.]

HARVEY RICE, Plaintiff and Appellant, v.
ROBERT TRAMMELL CROW et al., Defendants and Respondents.

## COUNSEL

Burgee & Abramoff and John G. Burgee for Plaintiff and Appellant.

Dimascio & Berardo and Dianne Dimascio for Defendants and Respondents Robert Trammell Crow, Robert Rickard and Ronald Cox.

Sandler & Rosen and Charles L. Birke for Defendant and Respondent Neal Pardee.

## Opinion

**MALLANO, J.\***—Plaintiff Harvey Rice (Rice) appeals from a summary judgment granted against him and in favor of Robert Trammell Crow (Crow), Neal Pardee (Pardee), Robert Rickard (Rickard) and Ronald Cox (Cox) (collectively Defendants). Relying on the decision in *Arciniega v. Bank of San Bernardino* (1997) 52 Cal.App.4th 213 [60 Cal.Rptr.2d 495] (*Arciniega*), Defendants argued, and the trial court agreed, that Rice's settlement and dismissal with prejudice of a legal malpractice action against his former attorneys arising from their representation of him earlier in these proceedings constituted a retraxit barring Rice's suit against Defendants. We conclude that *Arciniega* is flawed in its reasoning and that the settlement and dismissal of the legal malpractice action does not bar Rice's action against Defendants. We therefore reverse the judgment.

### Factual and Procedural History

#### A. *The Transaction Which Gave Rise to the Underlying Action*

Rice, in his declaration filed in opposition to Defendants' motion for summary judgment, provides the following description of the transaction which gave rise to the underlying action. On September 21, 1987, Crow, Rice and Pardee formed Crow, Rice, Pardee, Inc. (CRP) for the purpose of developing property located at 2539 Benedict Canyon Drive, Los Angeles, California (Property). Each owned one-third of its shares. Rice was the vice-president of CRP and primarily responsible for assisting with the design and marketing of a residence to be constructed on the Property. Crow was to oversee the financial aspects of the project, based upon his self-proclaimed experience as a developer. Crow insisted that Pardee, with whom he had a long-standing relationship, act as the general contractor. The three were directors of CRP along with Rickard, Crow's accountant, and Cox, Crow's long-standing friend and business associate, both selected by Crow.

The Property was acquired by CRP in May of 1988. Although the construction was scheduled to be completed within one year at a cost of $750,000, it took over two years. During construction, Crow advanced money to CRP for the project in a magnitude unknown to Rice, which sum purportedly totaled over $1.5 million, on which Crow claimed 10 percent interest.

In February of 1990, CRP entered an exclusive seven-month listing agreement with a real estate brokerage company with whom Rice was

---

\*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

affiliated to sell the Property for $3,295,000. Rice undertook to market the property, even though construction was not completed until after the listing agreement expired on September 30, 1990. During the listing period, Crow indicated his intention to purchase the Property, although he did not indicate the price he was willing to pay, and sought to have Rice curtail his marketing efforts. After the listing expired, Crow refused to extend it.

Rice nonetheless, in November 1990, obtained an offer to purchase the Property for $2.8 million. At the same time, Crow made an offer of $2.75 million. Rice had obtained an appraiser who valued the Property at $3.2 million. CRP's board of directors voted to approve the sale of the Property to Crow at his initial offering price. Rice did not receive a commission for the sale, to which he contended he would have been entitled had the Property been sold to the offeror that he had procured. He also claimed that Crow owed him a commission because Crow manifested his intent to purchase the Property during the listing agreement, even though he had not made a specific dollar offer until after the listing had lapsed.

Although Rice contended that at the beginning of the project it was agreed that Crow, Rice and Pardee would not receive compensation for their services (except Rice's commission on sale), Pardee, with Crow's support, claimed that it was agreed that he would receive 10 percent of the sale price of the project for acting as contractor.

After the sale of the Property to him, Crow, allegedly without the knowledge or approval of the other directors or officers of CRP, caused CRP in 1992 to commence a chapter 7 bankruptcy proceeding.

B. *The Underlying Action*

Rice commenced this action (underlying action) on January 4, 1991, against Crow, Pardee, Richard and Cox alleging that he was suing both individually and derivatively on behalf of CRP. He alleged causes of action for breach of written contract, breach of fiduciary duties, declaratory relief and quiet title. His first amended complaint was similar. Rice filed a second amended complaint at which time CRP was added as a putative defendant on the derivative claims. Individual claims for breach of fiduciary duties, accounting, involuntary dissolution and appointment of receiver, quantum meruit, fraud, constructive fraud, negligent misrepresentation, and securities fraud and derivative claims for breach of fiduciary duties and accounting were pleaded.

CRP obtained an order for Rice to post a $50,000 bond. (See Corp. Code, § 800, subd. (c).) Having been advised by his then counsel in the underlying

action, the law firm of Agapay, Leving and Halling (ALH), that he need not be concerned about filing the bond and losing his derivative claims because his individual claims would provide him with an adequate remedy, Rice never posted the bond and instead dismissed the derivative claims. After Defendants successfully demurred to portions of the second amended complaint, Rice filed a third amended complaint on September 23, 1991, indicating that he was only asserting claims as an individual.

In January of 1993, ALH obtained an order allowing it to withdraw as counsel for Rice in the underlying action. In December 1993, represented by new counsel, Rice negotiated an agreement with CRP's bankruptcy trustee to purchase the claims of CRP against its officers and directors. In anticipation of that agreement, the bankruptcy trustee approved CRP's filing a cross-complaint in the underlying action, claiming that the sale of the Property to Crow was invalid. Rice then obtained approval from the trial court to file a fourth amended complaint, asserting CRP's claims which had been assigned to him in the bankruptcy proceedings, as well as his individual claims which were contained in the previous complaint.

The underlying action went to trial and on December 21, 1995, the trial court entered a judgment of nonsuit against Rice on all of his claims. Rice then appealed to this court. We filed an unpublished decision on March 20, 1997, concluding that the trial court properly granted the nonsuit as to individual claims of Rice, but not as to the claims that Rice had been assigned out of the bankruptcy proceedings.

## C. Rice's Malpractice Action Against ALH

ALH was the second counsel to represent Rice in the underlying action. ALH's representation was memorialized by a retainer agreement in which ALH agreed to represent Rice "through all litigation with Defendants." Rice paid ALH a retainer of $25,000. Before ALH represented Rice, he was represented by Attorney Brian Oxman. During Oxman's representation, Rice was sanctioned in the amount of $12,000 for conduct which Rice ascribed to Oxman. ALH agreed to pursue the appeal that had been filed from that sanction order. However, on the advice of ALH, Rice abandoned the appeal and paid the sanction award. After CRP filed bankruptcy, ALH withdrew from representing Rice in the underlying action.

In April of 1994, Rice filed a malpractice action against ALH (the malpractice action). The first amended complaint contained causes of action for breach of contract, professional negligence, intentional and negligent misrepresentation and deceptive practices. It contained allegations that ALH

failed to appeal the sanction order and complete the representation of Rice in the underlying action, including neglecting to take the required action in the bankruptcy court. Rice sought damages for, among other things, the $12,000 which he paid in sanctions, the cost of securing new counsel to replace ALH and impairment of his ability to recover from Defendants. Trial of the malpractice action was scheduled for March of 1996.

In early 1996, ALH brought a motion for summary judgment in the malpractice action based on the statute of limitations. According to Rice, he believed that his claims against ALH for its advice to dismiss the derivative causes of action against Defendants and its failure to take action in the CRP bankruptcy were weak (he was unable to obtain an expert to testify); not so with respect to his claims for breach of the retainer agreement and failure to pursue the Oxman sanction appeal. Rice settled the malpractice action for what he described as "a substantial discount from the amount of damages that [he] had sustained and was claiming."

The settlement agreement between Rice and ALH provided that Rice was to receive $60,000 "to settle the Civil Action." ("Civil Action" was defined in the settlement agreement as the malpractice action.) The settlement agreement did not allocate the settlement moneys among the different claims asserted by Rice. It required dismissal of the malpractice action, with prejudice, on receipt of the settlement payment and contained a release of each of the parties "and . . . such other party's affiliated and subsidiary corporations, directors, officers, shareholders, employees, partners, representatives, agents, attorneys, insurers, adjusters, administrators, executors, heirs, and assigns . . . ." The settlement agreement also contained a Civil Code section 1542 waiver of unknown claims. It recited that it was "a compromise of disputed claims . . . ." On March 15, 1996, Rice filed the required request for dismissal with prejudice, dismissing the entire malpractice action.

## D.   *The Summary Judgment Motion in the Underlying Action*

As noted above, after the settlement and dismissal of the malpractice action, this court reversed a portion of the nonsuit against Rice in the underlying action pertaining to the claims which had been assigned to Rice in the bankruptcy proceedings, remanding the matter to the trial court. The nonsuit as to Rice's individual claims was affirmed on appeal. Before retrial of the underlying action, Defendants served a proposed supplement to their answer which had been previously filed, asserting the affirmative defenses of "retraxit and collateral estoppel."

On November 16, 1998, Defendants filed a motion for summary judgment asserting that, pursuant to their newly alleged affirmative defenses, Rice was

precluded from asserting his claims against Defendants by virtue of his settlement of the malpractice action and its dismissal with prejudice.

Defendants' separate statement and the evidence in support of it were largely undisputed. The evidence included, among other things, a copy of the fourth amended complaint in the underlying action, the first amended complaint in the malpractice action, and the settlement agreement in the malpractice action and its dismissal with prejudice.

Rice's separate statement in opposition to the summary judgment motion did not challenge the facts set forth in Defendants' statement of undisputed facts, although it did quarrel with the phrasing of several of them. Rice's separate statement introduced additional undisputed facts to the effect that the malpractice action included claims against ALH that the retainer agreement had been breached, that ALH improperly advised Rice to abandon his appeal with regard to the sanctions awarded during the Oxman representation and to pay those sanctions, that the malpractice action was settled at a substantial discount because Rice believed he would lose the summary judgment motion, and that Rice did not intend by settling the malpractice action to release Defendants.

Defendants' summary judgment motion rested upon the authority of *Arciniega,* which held that because an attorney-defendant in a legal malpractice action steps into the shoes of the original offending defendant (by virtue of the case-within-a-case doctrine), dismissal with prejudice of the malpractice action operates as a retraxit barring suit against the original offending defendant. Relying on *Arciniega,* the trial court granted Defendants' motion and judgment was entered. This appeal ensued.

## STANDARD OF REVIEW

The trial court's ruling on a motion for summary judgment is subject to de novo review. (*Ruoff v. Harbor Creek Community Assn.* (1992) 10 Cal.App.4th 1624, 1627 [13 Cal.Rptr.2d 755].) In conducting this review, the "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) To be entitled to judgment as a matter of law, the moving party must show by admissible evidence that the "action has no merit or that there is no defense." (Code Civ. Proc., § 437c, subd. (a).) A defendant moving for summary judgment meets this burden by showing that one or more elements of all causes of action cannot be established or that there is a complete defense to the action. (Code Civ. Proc., § 437c, subd. (o)(2).)

## Discussion

Defendants here sought and obtained summary judgment on the grounds that the defenses of retraxit and collateral estoppel which resulted from Rice's dismissal of his legal malpractice action against his attorneys in the underlying action barred suit, not only against those attorneys, but against Defendants as well. They claimed, relying on *Arciniega,* that retraxit "is the equivalent of a judgment on the merits and operates as a bar to a subsequent suit involving the same subject matter and either the same parties or, in the case of a malpractice action, attorneys who are proxies for the underlying defendants."

The issue dealt with in *Arciniega,* and which is involved in this case—the impact of a dismissal with prejudice of a malpractice lawsuit on a still pending action out of which the malpractice arose—is one that will likely arise with greater frequency. Recent decisions have determined that legal malpractice causes of action may accrue before the underlying litigation is concluded. As the Supreme Court stated in *Jordache Enterprises, Inc. v. Brobeck Phleger & Harrison* (1998) 18 Cal.4th 739 [76 Cal.Rptr.2d 749, 958 P.2d 1062] in rejecting the Court of Appeal's suggestion that "actual injury" for a malpractice cause of action does not accrue until related litigation concludes: "Actual injury refers only to the legally cognizable damage necessary to assert the cause of action. There is no requirement that an adjudication or settlement must first confirm a causal nexus between the attorney's error and the asserted injury." (*Id.* at p. 752.)

We begin our analysis by reviewing the applicable legal doctrines.

### A. *Retraxit*

The doctrine of retraxit finds it roots in the common law. At common law, a "retraxit" was "an open and voluntary renunciation of the suit in open court." (*Ghiringhelli v. Riboni* (1950) 95 Cal.App.2d 503, 506 [213 P.2d 17]; see also *Westbay v. Gray* (1897) 116 Cal. 660, 666 [48 P. 800].) The primary features of a common law retraxit were that it was made by the plaintiff in person and in open court. (*Roybal v. University Ford* (1989) 207 Cal.App.3d 1080, 1086 [255 Cal.Rptr. 469].) A dismissal with prejudice is the modern name for a common law retraxit. (*Robinson v. Hiles* (1953) 119 Cal.App.2d 666, 672 [260 P.2d 194]; *Lama v. Comcast Cablevision* (1993) 14 Cal.App.4th 59, 64 [17 Cal.Rptr.2d 224].)

A retraxit is a judgment on the merits preventing a subsequent action on the dismissed claim. It "has always been deemed a judgment on

the merits against the plaintiff, estopping him from subsequently maintaining an action for the cause renounced. . . . [¶] It has been frequently held that a judgment or order dismissing an action, based upon a stipulation or agreement of the parties settling and adjusting the claim or cause of action in suit and providing for the dismissal is a bar to another action for the same cause." (2 Freeman, Law of Judgments (5th ed. 1925) The Judgment as an Estoppel, § 757, pp. 1595-1596.) "[A] dismissal with prejudice [is] a retraxit constituting a decision on the merits invoking the principles of res judicata." (*Torrey Pines Bank v. Superior Court* (1989) 216 Cal.App.3d 813, 822 [265 Cal.Rptr. 217].)

Since a retraxit invokes the principles of res judicata, we must consider the applicability and ramifications of that concept.

B. *Res Judicata*

The doctrine of res judicata consists of two different aspects. (*Vezina v. Continental Cas. Co.* (1977) 66 Cal.App.3d 665, 669 [136 Cal.Rptr. 198].) First, " ' "it 'precludes parties or their privies from relitigating a *cause of action* that has been finally determined by a court of competent jurisdiction.' " ' " (*Ibid.*, italics added.) This aspect of res judicata has traditionally been referred to as "res judicata" or "claim preclusion." Second, " ' " 'Any issue necessarily decided in such litigation is conclusively determined as to the parties or their privies if it is involved in a subsequent lawsuit as to the parties on a different cause of action.' " [Citations.]' " (*Id.* at pp. 669-670.) This latter aspect of res judicata is known as "collateral estoppel" (*ibid.*) or "issue preclusion." (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 824 [88 Cal.Rptr.2d 366, 982 P.2d 229]; *Kelly v. Vons Companies, Inc.* (1998) 67 Cal.App.4th 1329, 1335 [79 Cal.Rptr.2d 763].)

Res judicata is applicable only to the same causes of action between the same parties or their privies. As stated in *Branson v. Sun-Diamond Growers* (1994) 24 Cal.App.4th 327, 340 [29 Cal.Rptr.2d 314]: " 'In its primary aspect, res judicata operates as a bar to the maintenance of a second suit *between the same parties* or parties in privity with them on the same cause of action.' " (Italics added.) (See also *Krier v. Krier* (1946) 28 Cal.2d 841, 843 [172 P.2d 681] ["It is settled, however, that a judgment in a prior action between the *same parties* on the identical cause of action is res judicata, and a bar to a second suit thereon . . . ." (Italics added.)]; *Goddard v. Security Title Ins. & Guar. Co.* (1939) 14 Cal.2d 47, 51 [92 P.2d 804] [" 'First, a final judgment, rendered upon the merits by a court having jurisdiction of the cause, is conclusive of the rights of the parties and those in privity with them, and is a complete bar to a new suit between them on the same cause of action. This is the general doctrine of res judicata' " (Italics omitted.)].)

■   Since a retraxit "invok[es] the principles of res judicata," it of course follows that a retraxit only bars claims dismissed with prejudice between the same parties or their privies. (*Datta v. Staab* (1959) 173 Cal.App.2d 613, 621 [343 P.2d 977] [" 'A retraxit is equivalent to a verdict and judgment on the merits of the case and is deemed to be a bar to another suit for the same cause *between the same parties. . . .' "* (Italics added.)]; *Torrey Pines Bank v. Superior Court, supra,* 216 Cal.App.3d at p. 820 ["A retraxit is equivalent to a judgment on the merits and as such bars further litigation on the same subject matter *between the parties."* (Italics added.)]; *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 312 [250 Cal.Rptr. 116, 758 P.2d 58] [" " 'Where the parties to an action settle their dispute and agree to a dismissal, it is a retraxit and amounts to a decision on the merits and as such is a bar to further litigation on the same subject matter *between the parties'* " ' " (Italics added.)].)

■   Since res judicata bars a subsequent action on the same claim between, not only parties to the first action, but also their privies, we must determine who qualifies as a privy to a prior action. In *Bernhard v. Bank of America* (1942) 19 Cal.2d 807 [122 P.2d 892], Justice Traynor stated: "Under the requirement of privity, only parties to the former judgment or their privies may take advantage of or be bound by it. [Citation.] A party in this connection is one who is 'directly interested in the subject matter, and had a right to make defense, or to control the proceeding, and to appeal from the judgment.' [Citations.] A privy is one who, after rendition of the judgment, has acquired an interest in the subject matter affected by the judgment through or under one of the parties, as by inheritance, succession, or purchase. [Citations.]" (*Id.* at p. 811.)

## C. *Collateral Estoppel*

■   Collateral estoppel is applicable to bar relitigation of *issues* previously litigated between the same parties on a different cause of action if the issues for which collateral estoppel is sought in the second action: (1) are identical to those litigated in the first action; (2) were actually litigated and necessarily decided in determining the first action; (3) are asserted against a participant in the first action or one in privity with that party; and (4) the former decision was final on the merits. (*McCutchen v. City of Montclair* (1999) 73 Cal.App.4th 1138, 1145 [87 Cal.Rptr.2d 95].) However, by abrogating the requirement of mutuality, *Bernhard v. Bank of America, supra,* 19 Cal.2d 807 expanded the concept of collateral estoppel. It permitted different parties, not a party to or in privity with a party to the prior action, to assert collateral estoppel defensively as a shield against one who was a party to the prior action to prevent the party to the prior action from relitigating an issue which it had already actually litigated.

## D. *Application of Above Discussed Concepts to the Case at Hand*

■ Application of the above concepts to the matter at hand does not bar Rice's action against Defendants. His settlement and dismissal with prejudice of the malpractice action operated as a retraxit so as to invoke the doctrine of res judicata. That doctrine precludes the parties to the malpractice action, or their privies, from suing each other again on the same causes of action which were settled. Thus, Rice is barred from suing ALH anew on any claims relating to ALH's representation in the underlying action and the fee agreement between them. Because Defendants were neither parties to the malpractice action, nor in privity with them by having acquired an interest in that action by inheritance, succession or purchase, they cannot invoke res judicata on their behalf.

The parties focus much attention on the question of whether the claims asserted in the malpractice action and those in the underlying action arise from the same "primary right" and hence constitute the same cause of action. We need not decide whether the right of a person against his or her attorney for breach of a professional duty of care arises from the same primary right as a claim brought by that person against a business associate for breach of fiduciary duty by self-dealing. Because res judicata only applies between the same parties or their privies, and Defendants are neither, it would make no difference that the claims in the underlying action and the malpractice action arose from the same primary right. (But we note the opinion in *Munoz v. Davis* (1983) 141 Cal.App.3d 420, 427 [190 Cal.Rptr. 400] ["The injury sustained by Rodriguez as a result of Munoz' [attorney malpractice] negligence—loss of a right of action—is entirely distinct from the injury that was the immediate consequence of Davis' negligence—physical injuries—and does not form a normal part of the aftermath of careless driving"].)

The doctrine of collateral estoppel is also of no avail to Defendants. It pertains to issue preclusion, preventing Rice from relitigating any *issues* in the underlying action which were identical to issues in the malpractice action. But in order to apply collateral estoppel, the issues in the first action must have been *actually litigated.* (*McCutchen v. City of Montclair, supra,* 73 Cal.App.4th at p. 1145.) ■ A settlement which avoids trial generally does not constitute actually litigating any issues and thus prevents application of collateral estoppel. (Rest.2d Judgments, § 27, com. e, p. 257 ["In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated"]; see also *Landeros v. Pankey* (1995) 39

Cal.App.4th 1167, 1171-1173 [46 Cal.Rptr.2d 165].)[1] Because the malpractice action was settled and not tried, collateral estoppel does not bar litigating any issue in the underlying action.

### E. *The Arciniega Opinion*

■■■ Defendants contend that this court should follow the novel, and we think flawed, reasoning of *Arciniega* which "meld[ed] two legal propositions, i.e., (1) the retraxit resulting from the court's dismissal of the legal malpractice action and (2) the case-within-a-case doctrine which characterizes legal malpractice cases." (*Arciniega, supra,* 52 Cal.App.4th at pp. 226-227.) We decline to do so because *Arciniega* attempts to meld two disparate legal concepts, relies on authority which does not support its conclusion, and misapplies the legal principles which we have discussed above.

In *Arciniega,* Leticia Arciniega (plaintiff) operated a check-cashing business. In connection with her business, she maintained a bank account with the defendant Bank of San Bernardino, N.A. (defendant bank). In October of 1986, she was the victim of a bogus check-passing scam perpetrated by El Faro Construction Co. (El Faro). The scam commenced when El Faro opened a checking account with defendant bank. El Faro presented to plaintiff what appeared to be payroll checks to cash. Plaintiff called defendant bank to verify that there were sufficient funds in El Faro's account to cover the checks. When told the funds were on hand, plaintiff cashed and deposited the checks with defendant bank that same day. After this procedure was established, El Faro sprung its deception on plaintiff. That occurred when plaintiff cashed checks received from El Faro after a call was made to defendant bank and confirmation was given that El Faro had an adequate balance to cover the checks. Although plaintiff deposited the checks with defendant bank the same day, someone appeared and withdrew all funds from El Faro's account, just before defendant bank's 6:00 p.m. closing. When defendant bank discovered that there were insufficient funds to cover the checks, it debited plaintiff's account and returned the checks. Plaintiff demanded that the aggregate amount of the checks, $7,353.37, be credited to her account. Defendant bank refused and suit was filed.

---

[1]We are mindful of that line of cases holding that a consent or stipulated judgment may properly be given collateral estoppel effect. (See, e.g., *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 664 [268 Cal.Rptr. 284, 788 P.2d 1156] (*CSAA*).) But this principle has no application here because there is no judgment, stipulated or otherwise. And this principle has been tempered in *Landeros v. Pankey, supra,* 39 Cal.App.4th 1167, 1172, which distinguished *CSAA,* by recognizing the rule that "a consent judgment is not usually given preclusive effect in subsequent litigation on a different cause of action, unless the parties manifest an intent in the consent judgment to give it preclusive effect." The settlement agreement here manifests no such intent but acknowledges that it is a compromise of disputed claims in order to avoid unnecessary expense.

Plaintiff employed the services of the law firm of Brunick and Pyle to file suit against defendant bank. On October 9, 1987, suit No. 1 (Suit 1) was filed, in which plaintiff alleged her damages to be $7,353.37, reflecting the amount of the returned checks. Suit 1 was dismissed without prejudice on or about April 18, 1988, and for some time the fact of the dismissal was unknown to plaintiff.

When plaintiff discovered the unauthorized dismissal, she brought a second action (Suit 2), for legal malpractice action, filed on January 3, 1992, against her former attorneys. In it she sought damages of $137,543 premised on nonspecific, boilerplate allegations of fraud and deceit and infliction of emotional distress. A first amended complaint was filed which increased the alleged damages to $265,498.53. On September 15, 1993, the malpractice action was settled for $60,000 and then dismissed, with no indication of whether it was with or without prejudice. On appeal, the court nonetheless concluded that it was with prejudice "because plaintiff does not contend otherwise. . . ." (*Arciniega, supra,* 52 Cal.App.4th at p. 216, fn. 1.)

With new counsel, on April 24, 1991, plaintiff instituted a new action (Suit 3) against defendant bank regarding the checks. But this time she alleged that as "a legal result" of defendant bank's refusal to pay the $7,353.37, plaintiff incurred $253,063.68 in "economic" damages. Although this action was filed before Suit 2, it remained dormant until after that action was settled.

Summary judgment was entered in Suit 3 in favor of defendant bank on the ground that plaintiff's receipt of $60,000 in settlement of Suit 2 (the legal malpractice action) barred plaintiff from further recovery against defendant bank under the "case-within-a-case" rule. Concerned with the potential for double recovery, the trial court concluded that the settlement ". . . fully compensated [plaintiff] for any claim for the aggregate amount of the El Faro checks she may have had against defendant . . . ." (*Arciniega, supra,* 52 Cal.App.4th at p. 223), and found that plaintiff provided no evidentiary material in opposition to the summary judgment to establish that her claim against the original tort feasor was "separate and apart" from her claim against her attorneys. (*Id.* at pp. 223-224.)

*Arciniega* quoted at length from the defendant bank's points and authorities, which noted that the policy behind compensatory damages was to compensate fully the plaintiff for all loss suffered, but not to place the plaintiff in a better position than she would have been if the wrong had not been committed. (*Arciniega, supra,* 52 Cal.App.4th at p. 221.) The court emphasized that " '[t]he general theory of compensatory damages bars

double the coverage [*sic*] for the same wrong.' " (*Ibid.*) It noted that when an attorney's negligence fails to press a meritorious claim, the measure of damages is the value of the claim lost. (*Ibid.*) The attorney thus "steps into the shoes," or is the proxy, of the original tortfeasor, the original defendant.

*Arciniega* observed that the malpractice action (Suit 2) "was precisely the same as that pleaded currently by plaintiff against defendant in . . . the underlying action [Suit 3]." (*Arciniega, supra,* 52 Cal.App.4th at p. 229.)

Overlooking the legal hurdle that the original defendant, the bank, was not a party to the settled, malpractice action, and with no analysis of the principle of res judicata, the court concluded that "[b]ecause of the 'proxy' status of the legal malpractice defendants, there is no logical reason why the judgment in their favor, represented by the dismissal [in the malpractice action] [citation], should not extend and redound to the benefit of defendant in [the underlying action.]" (*Arciniega, supra,* 52 Cal.App.4th at p. 231.) Accordingly, the trial court's ruling was upheld.

In seeking to "meld" the disparate legal theories of retraxit and "case-within-a-case," *Arciniega* relied on *Roybal v. University Ford, supra,* 207 Cal.App.3d 1080 (*Roybal*), which was characterized as containing a similar scenario. *Arciniega*'s reliance on *Roybal* is misplaced, as *Roybal* does not support *Arciniega*'s conclusion. *Roybal* presented a straightforward and faithful application of well-established res judicata principles. In *Roybal,* a complaint was filed in municipal court for negligence and other causes of action against University Ford by a plaintiff who claimed to have purchased a defective vehicle from that dealer. Thereafter, the plaintiff filed a second complaint against University Ford in the superior court, related to the same wrongful conduct. Two weeks later, the earlier-filed municipal court action was dismissed with prejudice. The superior court subsequently granted summary judgment on the ground that the second action was barred by res judicata as a result of the dismissal with prejudice of the municipal court action. The *Roybal* court concluded that the dismissal with prejudice of the municipal court action operated as a retraxit barring the superior court action. In *Roybal,* the second action, unlike in *Arciniega,* was between the same parties on claims arising out of the same wrongdoing. Thus, retraxit was invoked to bar the second action between the same parties, on the very claim which had been dismissed with prejudice.

We have found no case, nor has any been cited, in any of the 50 states, concluding as did *Arciniega* that a settlement and dismissal with prejudice of a legal malpractice case operates to bar the plaintiff from prosecuting a suit against the original wrongdoers in the underlying action out of which the malpractice arose.

*Arciniega* relies on the case-within-a-case doctrine to conclude that a retraxit occurred here. But that doctrine, if it be a doctrine at all, simply requires that to prove damages in certain types of legal malpractice lawsuits, the underlying case in which the malpractice allegedly occurred must be tried as part of the malpractice claim in order for the plaintiff to establish the amount of the damages caused by the malpractice. (4 Mallen & Smith, Legal Malpractice (4th ed. 1996) Litigation, § 32.8, pp. 168-169 & § 32.9, p. 172.) We perceive of no reason why that doctrine should operate to make a malpractice defendant-attorney the proxy of the original wrongdoer for res judicata purposes. A settlement with attorneys in a legal malpractice action may have little to do with the value of the underlying case against the original wrongdoer. To succeed in a malpractice action against an attorney, the plaintiff has the burden of proving additional elements, beyond those required in the underlying action against the original wrongdoer, including the attorney's failure to meet the professional standard of care. If the plaintiff fails to prove these added elements, he or she will not prevail against the attorney even though his or her damages caused by the original wrongdoer may be substantial. A settlement may also take into account the legal fees and costs which would be incurred in pursuing the malpractice action, including necessary expert witnesses' fees, which may have nothing to do with the value of the plaintiff's case against the original wrongdoer.

Rice sued ALH, in part, for damages which he could never have recovered against Defendants. He sought a refund of the $25,000 retainer which he paid to ALH to represent him in the underlying action. Such damages were not a part of his claim against Defendants and arose only incidental to the retention of the attorneys after the wrongdoing alleged in the underlying action had occurred. Rice also sued ALH for failing to pursue the appeal of the sanction award against Rice and recommended that he pay that sum, which he did. This sum also could not be recovered as damages against Defendants in the underlying action. There is no reason that Defendants should receive benefit from such recovery. Applying *Arciniega*, as Defendants urge, would unfairly bar such claims.

*Arciniega*, in dealing with a plaintiff found to have been fully compensated, established a rule which undermines the law's concern that a plaintiff be fully compensated. (See Civ. Code, § 3333 [providing that the measure of damages for a tort ". . . is the amount which will compensate [the injured party] for all the detriment caused . . . whether it could have been anticipated or not]".) While emphasizing that a plaintiff " 'is entitled *only* to be made whole' " (*Arciniega, supra,* 52 Cal.App.4th at p. 231, italics added), *Arciniega*, if followed here, would result in a plaintiff's not being made whole. As between an injured plaintiff and a wrongdoing defendant, we see

no cogent reason to allow the defendant off-the-hook simply because the plaintiff recovered in a legal malpractice action against the attorneys representing him or her against the wrongdoer.

The parties have not briefed, nor do we decide, whether the settlement in the malpractice action here may, under some theory, be asserted at all, in whole, or in part, as an offset by Defendants on any recovery by Rice in the underlying action. We similarly do not decide whether ALH might be entitled to reimbursement of some portion of the settlement it paid to Rice, if he is fully compensated by Defendants in the underlying action. All that we decide is that the retraxit between ALH and Rice in the malpractice action does not bar his suit against Defendants.

### DISPOSITION

For the foregoing reasons the summary judgment is reversed and this matter is remanded to the trial court for proceedings consistent herewith. Appellant is to recover his costs on appeal.

Boren, P. J., and Nott, J., concurred.

Respondents' petition for review by the Supreme Court was denied September 13, 2000.